COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Bumgardner and
          Senior Judge Hodges


BOYD ALEX TURNER, II
                                    MEMORANDUM OPINION*
v.    Record No. 2532-00-2                PER CURIAM
                                      MARCH 27, 2001
FREDERICKSBURG DEPARTMENT OF SOCIAL SERVICES


        FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
                    John W. Scott, Jr., Judge

        (Donald R. Skinker, on brief), for appellant.

        (Joseph A. Vance, IV, on brief), for
        appellee.


     Boyd Alex Turner, II (father) appeals the decision of the

circuit court terminating his parental rights to his infant son.

He contends the Fredericksburg Department of Social Services (DSS)

failed to prove by clear and convincing evidence:  (1) that it

offered rehabilitative services; and (2) that the conditions

resulting in neglect are not likely to be corrected or eliminated

within a reasonable time.  Upon reviewing the record and briefs of

the parties, we conclude that this appeal is without merit.

Accordingly, we summarily affirm the decision of the trial court.

Rule 5A:27.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

BACKGROUND

Alex Turner (the child) was born prematurely on February 18, 1999 at Mary Washington Hospital. He weighed 2 pounds, 5.8 ounces at birth. Both the child and the mother, Cheryl Chapman, tested positive for cocaine. The child remained in the hospital for forty-two days. During that time period, father visited four times and telephoned eleven times.[1]

On April 1, 1999, Kimberly Strader, a child protective service worker with DSS, filed a petition and affidavit in the juvenile and domestic relations district court (juvenile court) pursuant to Code § 16.1-252 to declare the child abused or neglected and to issue a preliminary removal order. In her affidavit, Strader documented her efforts at contacting and assisting the child's parents. Strader made unannounced visits at the parents' residence on March 11, 1999 and on March 23, 1999. Father was upstairs during the March 11 visit but did not come downstairs to talk with Strader. No one answered the door on March 23, 1999. In her April 1 affidavit, Strader described the child as "a special needs child [who] needs to be touched, held and talked to even more so than a child born completely healthy." According to Strader, "[t]he parents have not demonstrated a bond with this child which is evidenced by their

---

[1] The hospital nurses "documented 9 additional parental contacts, but did not indicate which type of contact occurred" and which parent made the contact.

-

infrequent visits." Because mother and child tested positive for cocaine, "services for substance abuse are critical to Alex's safety." Strader indicated her belief that the child "would be subjected to imminent threat to his life or health if he remains in his parents' custody upon his release from the hospital."

On April 8, 1999, the juvenile court found that the child would be subjected to an imminent threat to life or health if he were returned to or left in the custody of his parents, that reasonable efforts were deemed to have been made to prevent removal of the child and that no alternatives less drastic than removal existed to protect the child. After finding the child neglected or abused, the juvenile court placed him in DSS custody.

Vicki White, a social worker with DSS, sent to father letters dated April 13, 1999 and April 28, 1999, requesting that father make an appointment to see her to discuss and arrange for available services. Father never responded or contacted DSS.

On May 7, 1999, police arrested father for distributing cocaine. On September 8, 1999, appellant pled guilty to the charge and was sentenced to a ten-year prison term with seven years suspended. Father has been incarcerated since his May 7, 1999 arrest.

Social worker White prepared a Foster Care Service Plan on May 17, 1999, with a program goal of April 2000 for returning the child to the parents. White indicated that the child "had special

-

medical requirements that necessitated individualized training for the foster parent" and that the child was placed in a foster home "that could address his medical needs."  White explained that "[n]either parent has indicated any interest in this child" as evidenced by the fact that "[t]hey have not responded to letters scheduling appointments to discuss the child's service plan." However, White stated that "[p]arental support is expected." White indicated that DSS would refer mother and father for parenting classes and psychological evaluations in May 1999.  The target dates for completing the classes and evaluations were August 1999.

On June 17, 1999, the juvenile court approved the May 17 Foster Care Plan.  A foster care review hearing was scheduled for December 16, 1999.

On November 17, 1999, social worker White completed a Foster Care Service Plan review indicating what services had been provided to the parties, what progress had been made, barriers to achieving the goal of returning the child to the parents and the child's current health and educational status.  White explained that the "child has had no contact with parents."  White noted that the child "arches his back inappropriately," "has difficulty following objects with his eyes," "has unusual muscle tone," "is not making any attempts at speech," and "does not tolerate extreme amounts of stimuli."  As a result, he "has been referred to a neurologist and a pediatric opthamologist."

-

On March 21, 2000, DSS filed a Foster Care Service Plan changing the program goal to adoption. According to social worker White, "[t]he parents have never exercised their right to visitation" since DSS obtained temporary custody on April 8, 1999 and placed the child in a foster home. In part B of the Service Plan, White explained that adoption was selected as being in the child's best interest because both parents "were inconsistent in their visiting" the child in the hospital, "[n]either parent cooperated with Fredericksburg DSS for services to prevent the removal," and "both parents failed to have any contact with the department or child" after he was placed in foster care. White also noted that the parents "failed to attend appointments with DSS and other service providers" and that no appropriate relatives were available for placement.

The juvenile court approved the change of goal to adoption, and on May 4, 2000, it terminated father's residual parental rights.

On August 2, 2000, the trial court conducted a de novo hearing on DSS's petition to terminate father's residual parental rights. Included in the evidence was an evaluation prepared on July 19, 2000 by Dr. Susan Roseboro, a registered custody evaluator, "on the attachment relationship between" the child and his foster parents "in order to assist with placement decisions." Dr. Roseboro opined that the child had "developed a secure attachment relationship with [his] foster parents." She

-

characterized the child as a healthy attached child who has "internalized a sense of security and protection." "[C]ommunication between [the child] and foster parents is comfortable and easy." Dr. Roseboro explained that the child's "attachment security is related to the quality and consistency of [his] foster parents' responses to [his] emotional, physiological, and social needs during this crucial period of . . . development." Despite the child's "significant progress" since being with the foster parents, he is "still considered 'high risk.'" According to Dr. Roseboro, "[a] change in placement would disrupt the [child's] primary attachment relationship and could result in traumatization . . . with possible long-term psychological consequences." Noting that "[p]ermanency of placement is essential to [the child's] ability to form healthy attachment relationships," Dr. Roseboro recommended continued placement with the foster parents as being in the child's best interests.

On September 25, 2000, the trial court found that "termination of the father's residual parental rights . . . [was] in the best interest of the child." It further ruled that despite "the reasonable and appropriate efforts of [DSS, father] has been unwilling or unable to remedy substantially the conditions which led to and required continuation of the foster care placement."

TERMINATION UNDER CODE § 16.1-283

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount

-

consideration of a trial court is the child's best interests."

Logan v. Fairfax County Dep't of Human Development, 13 Va. App.

123, 128, 409 S.E.2d 460, 463 (1991).  "'In matters of a child's

welfare, trial courts are vested with broad discretion in making

the decisions necessary to guard and to foster a child's best

interests.'"  Id. (citation omitted).  The trial judge's findings,

"'when based on evidence heard ore tenus, will not be disturbed on

appeal unless plainly wrong or without evidence to support it.'"

Id. (citation omitted).

Under Code § 16.1-283(B), the parental rights of parents of

neglected or abused children may be terminated if the court finds

by clear and convincing evidence that it is in the best interests

of the children and that:

> 1.  The neglect or abuse suffered by
> such child presented a serious and
> substantial threat to his life, health or
> development; and
>
> 2.  It is not reasonably likely that
> the conditions which resulted in such
> neglect or abuse can be substantially
> corrected or eliminated so as to allow the
> child's safe return to his parent or parents
> within a reasonable period of time.  In
> making this determination, the court shall
> take into consideration the efforts made to
> rehabilitate the parent or parents by any
> public or private social, medical, mental
> health or other rehabilitative agencies
> prior to the child's initial placement in
> foster care.

Proof that "the parent or parents, without good cause, have

not responded to or followed through with appropriate, available

-

and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse" is prima facie evidence of the conditions set out in Code § 16.1-283(B)(2).

Although long-term incarceration does not, per se, warrant the termination of parental rights, incarceration is nevertheless a factor which may be considered in deciding the question. See Ferguson v. Stafford County Department of Social Services, 14 Va. App. 333, 340, 417 S.E.2d 1, 5 (1992).

ANALYSIS

Code § 16.1-283(B), under which DSS and the trial court proceeded, required a showing that it is not reasonably likely that the conditions leading to the child's neglect or abuse can be substantially corrected so as to allow the child's return within a reasonable period of time. In making that determination, the trial court "shall take into consideration the efforts made to rehabilitate the parent" by appropriate agencies "prior to the child's initial placement in foster care." Code § 16.1-283(B)(2). However, "'[r]easonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Ferguson, 14 Va. App. at 338-39, 417 S.E.2d at 4.

-

On March 11, 1999, three weeks after the child's birth, DSS visited mother and father's residence. Despite the fact that his son had serious medical needs and remained in the hospital battling the effects of cocaine, father stayed upstairs and did not speak with the DSS worker. Later, after the juvenile court found the child to be abused or neglected, DSS sent two letters to father asking him to contact DSS to discuss available services and arrange to receive them. Father failed to respond or attempt to meet with DSS to see what services were available.

After DSS obtained temporary custody and placed the child in foster care, father never visited or tried to arrange visitation with the child. On May 7, 1999, one month after DSS obtained custody, appellant was arrested for selling cocaine, the drug that contributed to much of the child's health and development problems. Father remained incarcerated from that date until the present.

An expert custody evaluator described the serious emotional, physical and developmental problems that the child faced, and how he overcame many of them and has progressed through the caring, responsible and loving involvement of the foster parents. The expert provided evidence that it would be difficult and possibly harmful to remove the child from the foster home where he is thriving and place him with father upon his release.

Father's minimal contact with the child before his May 7, 1999 incarceration precluded any bonding between them. Moreover,

-

father will not be released until the child is almost three years old.  By that time, the child will have formed a strong attachment to the foster parents, the only parents he has known.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities."  <u>Kaywood v. Halifax County Dep't of Social Servs.</u>, 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).  Here, the record fails to show that father ever exercised any parental responsibilities to resume; therefore, it would be speculation to assume that, at some future time, he might be able to establish a parental bond and correct the conditions leading to the abuse or neglect.

CONCLUSION

DSS presented clear and convincing evidence that it is not reasonably likely that the conditions which led to the child's neglect or abuse can be substantially corrected or eliminated to allow the child's return within a reasonable period of time. Accordingly, the decision of the circuit court is affirmed.

<u>Affirmed</u>.